FILED IN OPEN COURT
3·4·16

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLEDIVISION

CLERK, U S DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

UNITED STATES OF AMERICA

v.

CASE NO. 3:16-cr-34-J-25JRK

CARLA WILEY

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by A.
Lee Bentley, III, United States Attorney for the Middle District of Florida, the
United States Department of Justice Public Integrity Section (Criminal Division)
(hereinafter referred to collectively as the "United States"), and the defendant,
CARLA WILEY, and the attorney for the defendant, Justin E. Fairfax, Venable,
LLP, mutually agree as follows:

### A.  Particularized Terms

1.  Count(s) Pleading To

The defendant shall enter a plea of guilty to Count One of the Information.
Count One charges the defendant with Conspiracy to Commit Wire Fraud, in
violation of Title 18, United States Code, Sections 1349 and 1343.

2.  Maximum Penalties

Count One carries a maximum sentence of 20 years imprisonment, a fine
of $250,000, a term of supervised release of up to 3 years, and a special
assessment of $100 per felony count for individuals.  With respect to certain
offenses, the Court shall order the defendant to make restitution to any victim of

Defendant's Initials _CAW_                                          AF _BA_

the offense(s), and with respect to other offenses, the Court may order the

defendant to make restitution to any victim of the offense(s), or to the community,

as set forth below.

3. Elements of the Offense(s)

The defendant acknowledges understanding the nature and elements of

the offense(s) with which defendant has been charged and to which defendant is

pleading guilty. The elements of Count One are:

| First: | Two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit wire fraud, as charged in the information; and |
|---|---|
| Second: | The Defendant knew the unlawful purpose of the plan and willfully joined in it. |

4. Indictment Waiver

Defendant will waive the right to be charged by way of indictment before a

federal grand jury.

5. No Further Charges

If the Court accepts this plea agreement, the United States Attorney's

Office for the Middle District of Florida and the Public Integrity Section agree not

to charge defendant with committing any other federal criminal offenses known to

the United States at the time of the execution of this agreement.

6. Chapter Two Base Offense Level Stipulation

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States and the

defendant agree to jointly recommend to the Court that the defendant's Chapter

Two base offense level be calculated at 7 pursuant to USSG § 2B1.1(a)(1). The

Defendant's Initials _Caw_     2

parties understand that such a joint recommendation is not binding on the Court, and if not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

7. Chapter Two Loss Calculation – USSG Section 2B1.1(b)(1)(H)

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States, based on the information available to it, estimates that the defendant will receive a 14-level increase pursuant to USSG § 2B1.1(b)(1)(H) due to the loss exceeding $550,000. The parties understand that such an estimate is not binding on the Court, and if the Court calculates the loss differently, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

8. Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies

Defendant's Initials _Caw_                    3

with the provisions of USSG § 3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.4., the United States agrees to file a motion pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional level.  The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

9.   Cooperation - Substantial Assistance to be Considered

Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require.  If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policies of the United States, warranting the filing of a motion at the time of sentencing recommending (1) a downward

Defendant's Initials *Caw*                4

departure from the applicable guideline range pursuant to USSG § 5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both. If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policies of the United States, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b). In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

10. Use of Information - Section 1B1.8

Pursuant to USSG § 1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG § 1B1.8(b).

11. Cooperation - Responsibilities of Parties

a.     The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative intent by

Defendant's Initials  _Caw_                    5

assuming the fundamental civic duty of reporting crime. However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

b.      It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

(1)      The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

(2)      The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement. With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on

Defendant's Initials _Caw_            6

a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recision of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)     The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)     The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

(5)     The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts to which the

Defendant's Initials _Caw_                    7

defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

### 12. Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), whether in the possession or control of the United States, the defendant or defendant's nominees. The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil judicial or administrative forfeiture action. The defendant also hereby agrees to waive all constitutional, statutory and procedural challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the

Defendant's Initials _CAW_                8

judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all property subject to forfeiture and to transfer custody of such property to the United States before the defendant's sentencing. The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG §1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of his cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing. In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

The defendant agrees that the United States is not limited to forfeiture of the property specifically identified for forfeiture in this Plea Agreement. If the United States determines that property of the defendant identified for forfeiture cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction

Defendant's Initials  _Caw_                9

of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; then the United States shall, at its option, be entitled to forfeiture of any other property (substitute assets) of the defendant up to the value of any property described above. The Court shall retain jurisdiction to settle any disputes arising from application of this clause. The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

## B. **Standard Terms and Conditions**

### 1. Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, shall order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663, including

Defendant's Initials _Caw_                    10

restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (18 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. To ensure that this obligation is satisfied, the Defendant agrees to deliver a check or money order to the Clerk of the Court in the amount of $100, payable to "Clerk, U.S. District Court" within ten days of the change of plea hearing. The defendant understands that this agreement imposes no limitation as to fine.

2. Supervised Release

The defendant understands that the offense(s) to which the defendant is pleading provide(s) for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3. Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the

Defendant's Initials _Caw_                    11

background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count(s) to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

4. Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his/her financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he/she has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the

Defendant's Initials _CAW_                    12

defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

5. Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not

Defendant's Initials _Cau_    13

such decision is consistent with the government's recommendations contained herein.

6. Defendant's Waiver of Right to Appeal the Sentence

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

7. Scope of Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and The Public Integrity Section of the Department of Justice (Criminal Division) and cannot bind other federal, state, or local prosecuting authorities, although the undersigned will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

Defendant's Initials _Caw_                    14

8. Filing of Agreement

This agreement shall be presented to the Court in open court, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

9. Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the

Defendant's Initials _Caw_                    15

offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement.  The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

10. Factual Basis

Defendant is pleading guilty because defendant is in fact guilty.  The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

11. Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

Defendant's Initials  _CAW_                16

12. Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this 4th day of March 2016.

A. LEE BENTLEY, III
United States Attorney

Carla A. Wiley
Defendant

A. Tysen Duva
Assistant United States Attorney

Michael J. Coolican
Assistant United States Attorney

Justin E. Fairfax, Venable, LLP
Attorney for Defendant

Roger B. Handberg, III
Assistant United States Attorney
Chief, Criminal Division (North)

RAYMOND HULSER
Chief
Public Integrity Section
Criminal Division

Eric G. Olshan
Deputy Chief

Defendant's Initials  CAW                    17

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                      CASE NO. 3:16-cr-

CARLA WILEY

## PERSONALIZATION OF ELEMENTS

1. Between in or about late 2012 and in or about early 2016, did you
   agree to participate with other individuals to try to accomplish a
   common and unlawful plan to commit fraud, which ultimately involved
   some form of a wire transmission in interstate commerce (whether an
   email, bank account transfer, use of an ATM debit card, cellular
   telephone call, or text message)?

2. Did you know the unlawful purpose of the plan and willfully participate
   or join in it?

Defendant's Initials _CaW_                    18

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 3:16-cr-

CARLA WILEY

## FACTUAL BASIS[1]

The defendant, Carla Wiley ("Wiley"), is a resident of Leesburg, Virginia.

Person A is a public official.  Person B works for Person A.

### One Door for Education and Charitable Organization Status

On or about April 7, 2011, Carla Wiley submitted to the State Corporation

Commission ("SCC") for the Commonwealth of Virginia articles of incorporation

("AOI") for a "Virginia Nonstock Corporation" named "One Door for Education –

Amy Anderson Scholarship Fund" (hereinafter "One Door").  Amy Anderson is

the name of Wiley's mother.

The AOI specified that One Door was "organized exclusively for

charitable, educational, and scientific purposes under section 501(c)3 [sic] of the

Internal Revenue code, or corresponding section of any future tax codes."  Wiley,

who signed the AOI as an incorporator, was listed as One Door's "initial

---

[1] The Factual Basis is prepared by the United States.  The factual basis does not include
all pertinent or known facts concerning the charge and guilty plea, or all facts that the
defendant has knowledge of.  The factual basis is merely a set of facts designed to set
forth sufficient information that the Court uses to determine if there is indeed a factual
basis to accept the defendant's guilty plea.

Defendant's Initials _CaW_                    19

registered agent" and a "director" of the entity.  Wiley's home address was identified as One Door's "initial registered office address."

On or about May 3, 2011, the SCC issued a letter addressed to Wiley officially incorporating One Door in Virginia as of the same day.  The SCC assigned One Door the identification number ****908-5.  On or about May 16, 2011, One Door also obtained a Tax Identification Number ("TIN") from the U.S. Internal Revenue Service ("IRS")—**-***1887.  On or about September 30, 2012, the SCC automatically terminated One Door's corporate status for failure to pay an annual registration fee.  The entity was reinstated almost two years later, on or about June 16, 2014, after Wiley paid the necessary reinstatement fees.

One Door has never been a section 501(c)(3) tax-exempt organization. As such, at no time have contributions to One Door qualified as deductible charitable contributions.  Neither Wiley nor anyone else acting on behalf of One Door has filed federal or state tax returns for the entity for any tax year.

Under Virginia law, the Office of Charitable and Regulatory Programs (OCRP), a part of the Virginia Department of Agriculture and Consumer Services, is responsible for the administration of the Virginia Solicitation of Contributions Law (VSOC).  Pursuant to the VSOC, any entity soliciting charitable contributions in Virginia must be registered with OCRP, which publishes a list of any such registered entities.  At no time has One Door been registered with OCRP.

The State of Florida also imposes registration requirements for entities that solicit charitable contributions within the state.  Specifically, the Solicitation of

Defendant's Initials _CAW_                    20

Contributions Act requires anyone who solicits donations from people in Florida

to register with the Department of Agriculture and Consumer Services and renew

the registration annually.  At no time has One Door been registered to solicit

contributions in Florida.

**One Door's Website**

On or about April 9, 2013, Wiley registered the domain name

onedoor4education.com.  Between approximately 2013 and 2015, Wiley and

Person B coordinated on the appearance and content of One Door's website.  As

of in or about August 2014, the webpage contained four individual pages—

"Home," "About Us," "Services," and "Contact Us."

On the "Home" page, the website represented One Door's full title and

recited the entity's purported goal of "Providing scholarships and opportunities to

students pursuing a degree in Education as well as opening doors in the

community."  Included beneath this statement was the additional slogan:  "We

make your education dreams a reality."

The "About Us" tab contained the following narrative under the heading

"Our Mission":

> Established in 2012, in honor of Amy Anderson, 30-year retired
> Loudoun County School teacher, who believed that it was
> opportunity and love of the field that creates good teachers ~ not
> just good grades.
>
> The scholarship foundation creates such an opportunity for those
> students that have the desire, the potential and may not see it until
> the "Door of Opportunity" opens.

One Door also does a variety of work in the community to break down the small obstacles such as back packs, school supplies that some families might have so that all students have am [sic] opportunity to learn.

The "About Us" page also identified "Upcoming Events," including "A Night with [Person A]," a reference to a social reception held in Person A's honor in or about September 2014.

As of in or about August 2014, the website's "Contact Us" page provided Wiley's contact information, under the phrase "Where the path to enlightenment begins." The "Contact Us" page also listed One Door's SCC identification number (****9085) and IRS TIN (**-***1887) under the heading "For Donations."

Subsequent to in or about August 2014, Wiley and Person B made additional changes to the website, which were reflected on the website into early 2016. As part of these changes, Wiley and Person B changed the slogan "We make your education dreams a reality" on the "Home" page to "We make your education dreams a reality through events and fundraisers." In addition, the page was updated with a series of nine new photographs: Person A appeared in three pictures, and Wiley appeared in two.

The "Services" page of the updated website listed "Scholarships," "Financial Assistance to Families in the Community," "Volunteerism and Financial Support to the YMCA," and "Financial and Academic Support for Students in Need." The page contained three pictures, including two in which Wiley appeared. Finally, as of early 2016, the "Contact Us" page of the One Door website continued to include One Door's SCC identification number and IRS TIN,

Defendant's Initials _CaW_       22

and Wiley's home address and phone number.

### One Door Donations - Misappropriation of One Door Funds

Wiley first opened a checking account in One Door's name in or about May 2011 at Capital One bank. The initial account was closed in or about May 2012. In or about August 2012, Wiley established a new checking account at Capital One, also in One Door's name. Wiley signed the signature cards. No other individual has ever been formally affiliated with the account.

In or about 2012, after opening the second One Door bank account, Wiley gave to Person B the check book and debit card for the One Door account. Wiley subsequently gave to Person B new debit cards and checks for the One Door account. Between in or about 2012 and in or about January 2016, Person B used the One Door debit card to withdraw cash on dozens of occasions. Person B has also written and signed dozens of One Door checks using Wiley's name.

From in or about August 2012 through in or about January 2016, Wiley and Person B deposited approximately $800,000 into the One Door bank account—primarily via personal and corporate checks, several of which exceed $20,000. During the period in which Virginia had terminated One Door's corporate status—in or about October 2012 to in or about mid-June 2014—One Door deposits exceeded $400,000.

Defendant's Initials _CaW_          23

One Door donors included, among others, major corporations, private philanthropies, and entities and individuals based in Jacksonville, Florida, the Washington, D.C. area, and elsewhere. Between in or about 2012 and in or about 2016, Person A, Person B, and others acting on behalf of Person A solicited almost all of the donations to One Door. Checks from donors located in the Middle District of Florida have been negotiated and deposited at Capital One locations in Virginia, and many of the donations were transmitted to Wiley and Person B via the United States Postal Service or by commercial carrier.

Between in or about 2012 and in or about early 2016, One Door has distributed only one scholarship to purportedly cover expenses associated with attending a college or university—a $1,000 payment to an individual residing in Virginia. In contrast, the vast majority of funds deposited into the One Door bank account have been used for the personal or professional benefit of Person A, Person B, Wiley, and others. One Door expenditures include: (1) more than $140,000 in cash withdrawals by Wiley or account transfers from the One Door account to her personal bank account; (2) more than $150,000 in disbursements to cover costs associated with events hosted by Person A or held in Person A's honor; (3) tens of thousands of dollars in ATM cash withdrawals from the account of One Door for Education, the bulk of which were made in the city where Person B resides, that correspond to tens of thousands of dollars in cash deposits to Person A's bank accounts; (4) tens of thousands of dollars in checks made

Defendant's Initials *CAW*        24

payable to Person B; and (5) and other miscellaneous disbursements for the personal benefit of Person A, Person B, and Wiley.

Specifically, between in or about 2012 and in or about 2016, Wiley initiated approximately 160 individual transfers from the One Door account to her personal bank account totaling approximately $113,000. Transfers ranged in size from about $50 to $9,000, and on numerous occasions Wiley initiated multiple transfers on the same day. Wiley also initiated a total of at least $27,600 in withdrawals from the account. Further, Wiley initiated payments from the One Door account to a third-party payment service, totaling approximately $16,000, for the purpose of making payments on two vehicles in her name.

From 2012 through early 2016, Person B and Wiley and Person A and Person B (as well as others) communicated via Google mail (Gmail) and AOL email, which wire transmissions traveled in interstate commerce, regarding One Door funds or purported fundraising events. Person A and Person B and Person B and Wiley also communicated via cellular telephone regarding One Door funds or purported fundraising events.

### a. July 2013 golf tournament

Moreover, in or about mid-2013, Person A, Person B, Wiley, and others planned a golf tournament hosted by Person A and held in or about July 2013. The golf tournament was held at the TPC Sawgrass in Ponte Vedra Beach, Florida, and took place during the July 2013 national meeting of an industry trade group in Jacksonville, Florida. A flier for the golf tournament, which contained

Defendant's Initials _Cau_                25

Person A's picture and official seal of Person A's public office, represented that "One Door Education Foundation, Inc." was sponsoring the tournament "[t]o benefit the [trade group] Jacksonville Chapter Scholarship Fund and Other Community Non-Profits." One of Person A's employees was listed as a point of contact for the event.

Potential donors received letters on One Door letterhead that bore Person A's signature and official seal of Person A's public office. In addition to describing the golf event, the letter represented: "One Door for Education Foundation, Inc. is a non-profit organization that will use this golf outing to raise funds for [the trade group's] Jacksonville Chapter scholarship fund and other community non-profits." The letter continued: "I [i.e., Person A] am asking you to become a sponsor." An attached sponsorship form described sponsorship levels ranging from $125 to as high as $20,000, at which level a "sponsor" was eligible to play in a foursome with a public official. The donors were solicited to write checks to One Door.

In connection with the golf event—as well as other One Door donations—Wiley and Person B drafted and sent donors "Gift Receipts," bearing the One Door logo and stating: "For tax purposes, no goods or services were provided for this gift. One Door for Education is a 501(c)(3) Public Charity incorporated in Virginia. Its Tax ID is [\*\*-\*\*\*\*1887]." In fact, One Door was not properly registered as a 501(c)(3) organization and donations to the entity were not tax deductible.

Tens of thousands of dollars in One Door funds were used to cover

Defendant's Initials _Caw_           26

expenses related to the golf event hosted by Person A. Although numerous donors wrote checks to One Door in connection with the golf event, no money was raised for "[the trade group's] Jacksonville Chapter scholarship fund" or any other non-profit.

### b. Annual Receptions in Washington, D.C.

In or about September of 2012, 2013, 2014, and 2015, the One Door bank account was used to pay tens of thousands of dollars in expenses related to parties held during an unrelated non-profit foundation's week-long annual conference in Washington, D.C. In each year, Person A, Person B, Wiley, and others planned the events, which were held in Peron A's honor at luxury hotels in downtown Washington, D.C. In various years, One Door funds were used to pay for, among other things, transportation, catering, entertainment, and lodging, including lodging for Person B, Wiley, and several of Person A's employees.

In connection with the 2014 reception, expenses also included charges for an alcoholic beverage named for Person A and a birthday cake for a relative of Person A. Person B, Wiley, and others drafted and transmitted invitations to the annual parties, referring to each as "A Night with [Person A]" via U.S. Mail and email.

An invitation transmitted in 2013 contained Person A's picture, details of the event, and the following representation:

> The reception is being hosted by One Door For Education Foundation, Inc., which offers scholarships to underprivileged students pursuing education degrees . . . . We are hopeful that you will contribute to this worthy causes – any contributions will be

Defendant's Initials  *Caw*                27

appreciated.

Attendees comprised, among others, personal and professional acquaintances of Person A and Person B. Tickets to the events were free. Although tens of thousands of dollars in One Door funds were used toward expenses for each of the annual parties in 2012, 2013, 2014, and 2015, One Door raised no money for charitable causes in connection with these events.

### c.      Additional Events

In or about September 2013, Person A hosted a purported fundraiser in a luxury box during a music concert at an arena in Washington, D.C. Approximately $10,000 in One Door funds were used to pay expenses in connection with this event.

In or about September 2014, Person A hosted another purported fundraiser in a luxury box during an NFL football game in the Washington, D.C. area. More than $30,000 in One Door funds were used to pay expenses in connection with this event.

### Cash Withdrawals from One Door Account and Corresponding Cash Deposits into Person A's Accounts

On numerous occasions between in or about 2012 and in or about late 2015, Person B used the One Door debit card to withdraw cash from the One Door account at an ATM approximately two miles from Person B's residence, which is not in the same state as One Door's represented location. In numerous instances, after Person B (who was never signatory to the One Door account) made withdrawals from the One Door account, equal or similar amounts of cash

Defendant's Initials _Caw_            28

were deposited into one of Person A's personal accounts. For example:

    a. On or about September 7, 2012—approximately nine days after Wiley made the first deposit into the current One Door account—$800 in cash was withdrawn from the One Door account at a Capital One branch near Person B's residence. The same day, $800 in cash was deposited into one of Person A's personal accounts.

    b. On or about October 19 and 20, 2012, $800 in cash was withdrawn each day from the One Door account at the same Capital One branch near Person B' s residence, and on or about October 19 and 22, $1,000 and $800 in cash, respectively, were deposited into one of Person A's bank accounts at a branch also in the city of Person B's residence, and located approximately one mile from the Capital One branch.

    c. On or about February 25, 2013, $800 in cash was withdrawn from the One Door account at the same Capital One location in the city of Person B's residence and deposited into one of Person A's personal accounts at the same branch in that city.

    d. On or about August 9, 10, 11, 12, and 13, 2013, $800 in cash was withdrawn each day (for a total of $4,000 in

Defendant's Initials _Caw_       29

cash) from the One Door account at the same Capital One branch in the city of Person B's residence. On or about August 13, 2013, $3,000 in cash was deposited into one of Person A's personal accounts at the same bank branch.

e.  On or about January 24, 2014, $800 in cash was withdrawn from the One Door account at the same Capital One branch in the city of Person B's residence. On the same day, $800 in cash was deposited into Person A's personal account at the same location.

f.  On or about June 11, 2014, $800 in cash was withdrawn from the One Door account at the Capital One branch in the city of Person B's residence, and, on the same day, $500 in cash was deposited into one of Person A's personal accounts.

g.  On or about September 22, 2014, $1,900 in cash was withdrawn—in increments of $800, $800, and $300— from the One Door account at the Capital One branch in in the city of Person B's residence, and on the same day $1,600 in cash was deposited into one of Person A's personal accounts at a bank branch in that same city.

h.  On or about March 4, 2015, and March 17, 2015, $800 in

Defendant's Initials _CaW_          30

cash was withdrawn from the One Door account at the
Capital One branch in the city of Person B's residence,
and on each day a corresponding $800 cash deposit into
one of Person A's personal accounts.

i.  On or about July 20, July 24, and July 28, 2015, $800 in
cash was withdrawn from the One Door account at the
Capital One branch in in the city of Person B's residence,
and $800, $800, and $700 in cash was deposited on
each day, respectively, into one of Person A's personal
accounts at a bank branch in that same city.

**Person B's Access to and Misuse of One Door Funds**

Between in or about 2012 and in or about 2015, in addition to cash that
Person B withdrew using the One Door debit card, Person B also received tens
of thousands of dollars in checks written from the One Door account. During this
time, Person B also used the One Door debit card to cover numerous personal
expenses, including, among other things, airfare, lodging, and a rental car in
connection with a personal trip Person B and Wiley took to Miami Beach, Florida;
and work performed on Person B's personal luxury vehicle. These expenses did
not further One Door's purported charitable goals.

On numerous occasions between in or about 2012 and in or about 2015,
Person B asked Wiley to check the One Door account balance. On numerous
occasions between in or about 2012 and in or about 2015, Person B sent donor

Defendant's Initials _Cau_          31

checks to Wiley using Federal Express labels associated with an account in the name of Person A's public office.

### Miscellaneous Expenditures

Additional One Door funds have been used for the personal benefit of Person A, Person B, Wiley, and others, and not to further the entity's purported charitable goals. These additional expenses include airfare for Person A and Person B. For example, One Door funds were used to pay for Person A's travel on at least two occasions—a flight from Jacksonville to Fort Lauderdale, Florida, on or about December 16, 2012, and a flight from Jacksonville, Florida, to Washington, D.C., on or about December 29, 2012. Likewise, One Door funds were used to pay for Person B's flights from Baltimore, Maryland, to Jacksonville, Florida on or about September 28, 2012 and on or about July 12, 2013.

In or about September 2014, $5,000 in One Door funds were used to help pay for a commemorative issue of a Florida-based magazine. The focus of the commemorative issue was Person A, whose picture appeared on the cover along with Person A's campaign slogan. Although One Door funds were used to cover expenses related to the magazine, the cover indicated that it had been paid for by Person A's campaign.

### Person A's, Person B's, and Carla Wiley's Omissions

At no time did Person A, Person B, or Wiley disclose to One Door donors that funds from the One Door bank account were being used for the personal

Defendant's Initials _Caw_            32

benefit of Person A, Person B, and Wiley, and not solely in support of One Door's purported educational and charitable mission.